**BETHESDA FORD, INC.**

v.

**FORD MOTOR COMPANY.**

**Civ. No. Y–82–206.**

United States District Court,
D. Maryland.

Sept. 30, 1983.

624

Elbert R. Shore, Rockville, Md., and M. Albert Figinski, Baltimore, Md., for plaintiff.

Paul V. Niemeyer, Baltimore, Md., and Deborah E. Jennings, Baltimore, Md., for defendant.

MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

This action arises out of the franchise termination of a large automobile dealer in Bethesda, Maryland. Plaintiff Bethesda Ford, Inc. ("Bethesda Ford") originally filed suit in the Circuit Court for Montgomery County. Bethesda Ford's four count declaration alleged breach of contract and violation of three separate "dealer protection" statutes. Md.Transp.Code Ann. § 15–207 (Michie 1977); Md.Transp.Code Ann. § 15–209 (Michie 1977);[1] and 15 U.S.C. § 1222.

Defendant Ford Motor Company ("Ford") promptly removed the action to this Court, 28 U.S.C. § 1441, and counterclaimed for breach of contract. This counterclaim added Ford's wholly owned subsidiary Ford Motor Dealership Facilities Co. ("Facilities Co.") as counterclaim plaintiff and Bethesda Ford's holding company J.J.F. Management Services, Inc. ("J.J.F.") as counterclaim defendant. Fed.R.Civ.P. 13(h). Judge Shirley Jones, former United States District Judge for the District of Maryland, upheld the propriety of this dual joinder in a Memorandum Opinion and Order of May 4, 1982.

Counterclaim defendant J.J.F. thereafter filed its own counterclaim against original counterclaim plaintiffs Ford and Facilities Co. See Fed.R.Civ.P. 13(a) ("pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party" if the counterclaim arises out of the transaction or occurrence that is the subject matter of the opposing party's claim); cf. 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1404 at 21 (1971) (additional party brought in under Fed.R.Civ.P. 13(h) for purposes of responding to a counterclaim becomes an "opposing party"). This second counterclaim, which for the sake of clarity will be denominated the "cross-counterclaim," seeks the alternative state law equitable remedies of reformation, specific performance, and cancellation.

Three motions are currently pending before the Court. Ford and Facilities Co. have moved for partial summary judgment on all issues of liability, claiming that certain previous findings of the Maryland Motor Vehicle Administration ("MVA") require the application of the doctrine of *res judicata*. Fed.R.Civ.P. 56(a). Bethesda Ford has moved for an "interlocutory" injunction, see Fed.R.Civ.P. 65, and for leave to supplement Count IV of its declaration, Fed.R.Civ.P. 15(d).

After careful consideration of the relevant authorities, the Court grants the summary judgment motion in part and denies it in part. Judgment will be entered in favor of Ford on Counts I and II of the original declaration and in favor of Ford and Facilities Co. on all three counts of the cross-counterclaim. In addition, the Court will give "issue preclusion" effect to all appropriate MVA findings in subsequent litigation of Counts II and IV of the original declaration. However, the MVA decision will have neither "claim preclusion" nor "issue preclusion" effect in subsequent litigation of Ford and Facilities Co.'s counterclaim. Finally, the Court grants the motion to file a supplemental pleading and denies the motion for an interlocutory injunction. A more detailed explanation of the nature of and basis for these rulings follows.

FACTUAL AND PROCEDURAL BACKGROUND

Despite the rather vigorous nature of this litigation, many facts are not in dispute. Bethesda Ford became a Ford dealer in 1970. At that time, it executed the standard Ford Sales and Service Agreement ("Sales and Service Agreement") which was to govern the terms of its franchise. Paragraph 5(a) of the Sales and Service Agreement provided that "[t]he Dealership shall establish and maintain at the Dealership Location approved by the Company Dealership Facilities of satisfactory appearance and condition and adequate to meet the Dealer's responsibilities under this Agreement." With the exception of a four month

---

1. A dealer may enforce his rights under both § 15–207 and § 15–209 in a private action for damages under Md.Transp.Code Ann. § 15–213 (Michie 1977).

period in 1981, Bethesda Ford's dealership facilities were located on Elm Street in Bethesda for the entirety of its Ford franchise. While the sufficiency of the Elm Street facilities under Paragraph 5(a) of the Sales and Service Agreement is currently in dispute, it does not appear to be contested that Bethesda Ford made attempts to relocate during the 1970's and that Ford assisted it in its efforts.

The present controversy centers around Ford's attempts at "assisting" Bethesda Ford in establishing a new facility on an undeveloped lot near the Montgomery Mall shopping center in Bethesda ("Montgomery Mall property"). To aid Bethesda Ford in establishing this new facility, Ford encouraged Bethesda Ford to avail itself of Ford's capital and expertise through Ford's Turn Key Real Estate Assistance Program ("Turn Key Program"). Bethesda Ford accepted Ford's invitation on October 30, 1978 and entered into a four way agreement ("1978 Agreement") with J.J.F., Facilities Co., and Ford Leasing Development Co. ("Leasing Co."), another wholly owned Ford subsidiary. Under the terms of the 1978 Agreement, which followed the basic pattern of the Turn Key Program, Facilities Co. agreed to purchase the Montgomery Mall property and construct an appropriate facility. J.J.F. would then purchase the improved property from Facilities Co. and lease it to Bethesda Ford. If J.J.F. needed additional financing to make this purchase, Leasing Co. would execute a second mortgage loan to J.J.F. In return, Leasing Co. would acquire the option to lease the facility from J.J.F. and in turn sublease it to Bethesda Ford. Exercise of this option would provide Ford through its subsidiary lessee Leasing Co. with the right of "site control," or the right to ensure that the property would be used exclusively as a Ford dealership for the duration of the Leasing Co. lease. However, this privilege of "site control" would only arise if J.J.F. obtained second mortgage financing from Leasing Co.

For reasons currently under dispute, the parties found it necessary to execute a subsequent and superceding letter agreement for the development of the Montgomery Mall site. On October 1, 1980, the four parties to the 1978 Agreement signed a letter contract ("1980 Agreement")[2] which expressly terminated the 1978 Agreement and set up a new framework for Bethesda Ford's acquisition of the site. Under this new arrangement, Bethesda Ford would lease the property from Facilities Co. from April 1, 1981 through March 31, 1982. On or before March 31, 1982, J.J.F. would then purchase the property from Facilities Co. "under the terms of the Dealership Facility Purchase Plan ("the DFPP")." The final paragraph of the 1980 Agreement specifically provides:

The Dealer and J.J.F. agree that if (i) the Dealer does not execute the Lease within 30 days after it is requested to do so, (ii) after executing the Lease the Dealer fails to relocate to the new site within 30 days after the commencement of the terms of the Lease, or (iii) the Dealer and J.J.F. fail to purchase the Facility under the DFPP on or before March 31, 1982, the Dealer shall be deemed to have failed to fulfill its responsibilities under Subparagraph 5(a) of the Dealer's Ford Sales and Service Agreement with the Company, and the Company may elect to terminate such Sales and Service Agreement by giving the Dealer the 90 days' prior notice specified in Subparagraph 17(c)(4) thereof.

The crux of the parties' dispute centers around the 1980 Agreement's terms for J.J.F.'s purchase of the property. The letter itself merely specifies that J.J.F. would purchase the property pursuant to the DFPP. Bethesda Ford and J.J.F. maintain that they believed that the DFPP was but another name for the Turn Key Program incorporated into the 1978 Agreement and summarized previously.

2. The 1980 Agreement itself superceded a 1979 letter agreement which was for all relevant terms identical to the 1980 Agreement.

However, the DFPP was in fact an entirely distinct Ford program which required J.J.F. to execute a fixed rental twenty year lease of its newly acquired property to Leasing Co. *regardless* of whether Leasing Co. provided financing to J.J.F. for the purchase. While Leasing Co. would presumably sublease to Bethesda Ford, execution of the twenty year lease would give Ford a lengthy period of "site control" through its subsidiary lessee Leasing Co. As stated earlier, the practical upshot of this provision would be that Bethesda Ford would not be able to switch franchises at the Montgomery Mall facility for at least a twenty year period. Ford and Facilities Co. insist that the signatories of the 1980 Agreement were fully apprised of the relevant provisions of the DFPP at the time they executed the 1980 Agreement, but Bethesda Ford and J.J.F. assert that they only became aware of the variant provisions of the DFPP in April, 1981.

After this alleged misunderstanding arose, Bethesda Ford occupied the Montgomery Mall site from April 24, 1981 to August 31, 1981, but refused to sign the lease required by the 1980 Agreement. When Bethesda Ford returned to its Elm Street location, Ford notified Bethesda Ford on October 5, 1981 that it would be terminating the Bethesda Ford franchise. Ford indicated that the grounds for its decision to terminate were the last paragraph of the 1980 Agreement and paragraph 5(a) of the Sales and Service Agreement. Pursuant to both the supplemental agreement and certain statutory provisions, the termination was not to become effective until February 21, 1982.

After receiving notice of its termination, Bethesda Ford commenced this suit in the Circuit Court for Montgomery County. Bethesda Ford initially obtained an *"ex parte"* injunction from the Circuit Court which temporarily enjoined its termination. Similar to a federal temporary restraining order, Fed.R.Civ.P. 65(b), the *ex parte* injunction was to remain in effect until January 28, 1982, at which time the Circuit Court would rule upon the appropriateness of an "interlocutory" injunction to continue the stay in effect until a full hearing on the merits, *cf.* Fed.R.Civ.P. 65(a) (preliminary injunction). On January 27, 1982, the day before the scheduled interlocutory injunction hearing, Ford removed the action to this court pursuant to 28 U.S.C. § 1441. Despite Bethesda Ford's protestations, a preliminary injunction hearing was not thereafter scheduled in Federal District Court, although an expedited hearing on the merits was scheduled on April 21, 1982.[3]

Faced with the need to stay the February 21 effective termination date, and unable to obtain timely injunctive relief in this Court, Bethesda Ford requested a hearing before the MVA pursuant to Md.Transp.Code Ann. § 15–209 (Michie 1977) to determine whether Ford had "wrongfully terminated" its franchise as proscribed by that statute. By requesting a § 15–209 hearing, Bethesda Ford obtained the immediate relief of a stay of its termination pending final decision by the MVA. Md.Transp.Code Ann. § 15–209(c)(2) (Michie 1977). However, Bethesda Ford's tactical decision to seek relief under § 15–209 also produced a written MVA determination on July 22, 1982 concluding that Bethesda Ford had not been in "substantial compliance" with the terms of its franchise and that Ford had therefore not "wrongfully terminated" it. At the commencement of the MVA hearing, counsel for Bethesda Ford stressed that the hearing examiner could not determine whether it had "substantially complied" with the 1980 Agreement without considering "the circumstances that led up to that letter" agreement. Counsel in effect argued that Bethesda Ford and J.J.F. had "substantially complied" with the 1980 Agreement which they thought existed. Nevertheless, after an extended hearing which included two days of testimony by

---

**3.** Bethesda Ford currently challenges the propriety of former Judge Jones' actions in scheduling its case upon removal from the Circuit Court. Any such contentions should have been raised in an interlocutory appeal, *see* 28 U.S.C. § 1292(a)(1), and the Court will not consider them here.

John J. Fitzgerald, sole owner of J.J.F., the MVA found "that Mr. Fitzgerald's claim that he was not aware of site control is not supported by the evidence and that Dealer did not have a proper basis to refuse to sign the lease with DFPP addendum." Consequently, the MVA ruled that "Dealer's refusal to sign the lease under the DFPP was contrary to and in breach of its undertaking as contained in the letters to relocate dated October 25, 1979 and October 1, 1980" and that "it was bound [by the last paragraph of the 1980 Agreement] to a termination of its Sales and Service Agreement." These findings followed a lengthy marshalling and review of the evidence.

Bethesda Ford thereupon sought judicial review of the MVA decision in Montgomery County Circuit Court pursuant to Md. Transp.Code Ann. §§ 15–209(c)(1), 12–209 (Michie 1977). In a Memorandum and Order of January 7, 1983, the Circuit Court affirmed the MVA ruling. The Circuit Court did not conduct a *de novo* review but instead evaluated the "lengthy" [1300 page] record under a "substantial evidence" standard. While no appeal lay from the adverse ruling of the Circuit Court, Md.Ann. Code art. 41, § 256 (Michie 1982 replacement volume), Bethesda Ford nonetheless sought an appeal with the Maryland Court of Special Appeals. This attempt was summarily rejected, as was Bethesda Ford's subsequent petition for a writ of certiorari from the Maryland Court of Appeals. Ford and Facilities Co. now seeks to have *res judicata* effects attach to the Circuit Court judgment.

FULL FAITH AND CREDIT STATUTE

28 U.S.C. § 1738 provides in relevant part:

> "The ... judicial proceedings of any court of any ... State ... shall have the same full faith and credit in every court within the United States ... which they have by law or usage in the courts of such State ... from which they are taken."

With two exceptions, § 1738 requires that federal courts accord state court judgments which affirm state administrative agency decisions the same preclusion effects that those judgments would be given in the courts of the State in which they were rendered. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). Neither exception applies here. *Kremer* initially indicates that Congress can "impliedly repeal" § 1738 by "clearly manifesting" its intent to depart from § 1738. *Kremer*, 456 U.S. at 468–78, 102 S.Ct. at 1890–96. Only Bethesda Ford's count for violation of the federal "Dealer Day In Court Act," 15 U.S.C. §§ 1221–25, could possibly qualify for this exception. Comparison of the language of the Dealer Day In Court Act with Title VII of the Civil Rights Act of 1964,[4] at issue in *Kremer*, indicates that the Dealer Day In Court Act does not meet the stringent standards enunciated in *Kremer*. Title VII expressly provides that "findings and orders made by State or local law authorities" need not be accorded "substantial weight." 42 U.S.C. § 2000e–5(b). Section 2000e–5(b) is far more potentially inconsistent with § 1738 than any provision of the Dealer Day In Court Act is, but *Kremer* holds over a vigorous dissent that § 2000e–5(b) does not apply to state court proceedings and hence does not abrogate traditional *res judicata* doctrines and impliedly repeal § 1738.

Bethesda Ford points to certain aspects of the legislative history of the Dealer Day In Court Act as evidence that it impliedly repeals § 1738. These excerpted passages establish nothing more than the somewhat obvious proposition that Congress enacted the Dealer Day In Court Act to provide automobile dealers with a federal forum in which to redress their grievances. "But in doing so, Congress was adding to the jurisdiction of the federal courts, not subtracting from that of the state courts." *Allen v. McCurry*, 449 U.S. 90, 99, 101 S.Ct. 411, 417, 66 L.Ed.2d 308 (1980). *Allen* held that 42 U.S.C. § 1983 did not impliedly repeal § 1738, despite certain indications in the legislative history of § 1738 that the Recon-

4. 42 U.S.C. § 2000e et seq.

struction Congress did not believe that the state courts were effectively enforcing the civil rights of the newly freed slaves. *Allen,* 449 U.S. at 98–99, 101 S.Ct. at 416–417. The legislative history of the Dealer Day In Court Act indicates no similar Congressional concern about the fairness of state courts in protecting the rights of automobile dealers, and is less supportive of an implied repeal of § 1738 than the legislative history rejected by the Supreme Court in *Allen.*

■ *Kremer* also states that § 1738 will not apply when "the party against whom the earlier decision is asserted did not have a full or fair opportunity to litigate the claim or issue." *Kremer,* 456 U.S. at 480–81, 102 S.Ct. at 1896–97; accord *Haring v. Prosise,* —— U.S. ——, ——, 103 S.Ct. 2368, 2373–74, 76 L.Ed.2d 595 (1983); *Allen,* 449 U.S. at 101, 101 S.Ct. at 418. However, a "full and fair opportunity to litigate" is provided for § 1738 purposes if the state court has satisfied "the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer,* 456 U.S. at 481, 102 S.Ct. at 1897. *Kremer* primarily examined the procedures available at the state administrative proceedings in making this minimal Due Process evaluation. *Kremer,* 456 U.S. at 483–85, 102 S.Ct. at 1898–99. In the MVA proceeding, Bethesda Ford was represented by counsel, had full opportunity to cross examine witnesses, introduced several days of testimony and numerous exhibits, and received an eleven page opinion. These procedures certainly satisfy the elementary standards required by *Kremer. Id.* As neither of *Kremer*'s two exceptions apply,[5] the Court must accord the Circuit Court affirmation of the MVA ruling the preclusive effect it would be accorded under Maryland law.

## MARYLAND RES JUDICATA PRINCIPLES

■ In Maryland, the basic rules of *res judicata* fully apply to judicial affirmances of administrative agency decisions. *Fertitta v. Brown,* 252 Md. 594, 599, 251 A.2d 212 (1969); *Woodlawn Association v. Board,* 241 Md. 187, 195, 216 A.2d 149 (1966); *Baltimore v. Linthicum,* 170 Md. 245, 246, 247–48, 183 A. 531 (1936); *Jack v. Foster Branch Homeowners Association No. 1, Inc.,* 53 Md. App. 325, 332, 452 A.2d 1306 (1982); *Brandt v. Montgomery County Commissioner on Landlord-Tenant Affairs,* 39 Md.App. 147, 162–64, 383 A.2d 688 (1978). The *res judicata* status of administrative agency determinations which have *not* been subjected to judicial review is in considerable flux. *See, e.g., Cicala v. Disability Review Board,* 288 Md. 254, 264, 418 A.2d 205 (1980). However,

> [w]hatever view may be taken of the applicability of the principles of the doctrine of res judicata to administrative or quasi-judicial determinations or acts of an agency, the text writers and the courts are in general agreement that the judgment or order of a court, including a trial court, which affirms or reverses such determinations or actions, ordinarily is. [59c].

*Woodlawn* 241 Md. at 195, 216 A.2d 149. While no further appeal could have been taken from the Circuit Court affirmance in the instant case, the Court of Appeals has specifically ruled that non-appealability does not strip a Circuit Court affirmance of its preclusive effect. *Baltimore v. Linthicum,* 170 Md. at 247–48, 183 A. 531. *But cf. Cook v. State,* 281 Md. 665, 674–75, 381 A.2d 671 (appealability a "relevant factor" in determining preclusive effect to be accorded previous granting of motion to suppress evidence in criminal case).

■ Maryland recognizes the standard rule that preclusive effects only attach to judgments which are both valid and final. *See, e.g., Cook v. State,* 281 Md. at 668–69, 381 A.2d 671; *Snodgrass v. Stubbs,* 192 Md. 287, 290–91, 64 A.2d 130 (1949). Bethesda

---

**5.** The Court notes that recent dicta in *Haring v. Prosise* suggest that additional exceptions to § 1738 may exist. *Haring v. Prosise,* —— U.S. at ——, 103 S.Ct. at 2372. This dicta ignores *Kremer* and is extremely difficult to reconcile with *Allen v. McCurry.* As none of the additional exceptions hypothesized in *Haring* exist here, the Court need not attempt the challenging task of squaring *Kremer* with *Haring.*

Ford does not appear to challenge the finality of the Circuit Court affirmance,[6] but instead challenges its jurisdictional validity, claiming that the MVA lacked statutory authority to consider any issue except the suitability of the Elm Street facilities under paragraph 5(a) of the Sales and Service Agreement. The Court believes that the MVA was not so circumscribed in its decision.

Md.Transp.Code Ann. § 15–209 (Michie 1977) provides in relevant part:

(a) *In general.*—A manufacturer, distributor, or factory branch may not terminate, cancel, or fail to renew the franchise of a dealer, notwithstanding any term or provision of the franchise, unless:

(1) The dealer has failed to comply substantially with the reasonable requirements of the franchise . . .

(c) *Hearing.*—(1) If a dealer receives written notice that his franchise is being terminated, cancelled, or not renewed, the dealer may, within the notice period required by this section, request a hearing under Title 12, Subtitle 2 of this article to determine whether the dealer has failed to comply substantially with the reasonable requirements of the franchise . . .

Bethesda Ford asserts that the term "the franchise" as employed in § 15–209 only includes the original Sales and Service Agreement. However, the Court perceives no basis for such a restrictive definition of the term "franchise;" the word should instead encompass all oral or written understandings between the franchisor and franchisee, limited only by the possible applicability of the Statute of Frauds on parol evidence rule.[7] A broad interpretation of the term would provide automobile dealers

with a safeguard against the contracts of adhesion which predominate in the franchise area and would further the protective purpose which appears to lie behind § 15–209.

At the MVA hearing, Bethesda Ford specifically requested that the hearing examiner look beyond the documentary evidence and consider Bethesda Ford's alleged misunderstanding of the differences between the Turn Key and DFPP programs. As mentioned earlier, Bethesda Ford was in effect arguing that it had "substantially complied" with what it thought the "terms of the franchise" were. Given these allegations, the hearing examiner had no alternative but to examine the Sales and Service Agreement, the subsequent letter contracts, and the alleged oral understandings to determine exactly what the "franchise" was. Only then could he properly assess whether Bethesda Ford had "substantially complied" with that franchise. The hearing examiner undertook this burdensome task and arrived at determinations adverse to Bethesda Ford. Bethesda Ford will not now be allowed to challenge the MVA's authority to resolve issues which it created; the hearing examiner was not exceeding his jurisdiction but instead was merely following his statutory mandate in an extremely complicated factual context.

In Maryland as elsewhere, final and valid judgments are accorded the separate preclusive effects of *res judicata* ("claim preclusion")[8] and collateral estoppel ("issue preclusion"). As the Maryland Court of Appeals has stated in recently reiterating this distinction,

if a proceeding between parties involves the same cause of action as a previous

---

**6.** It is difficult to see how Bethesda Ford could challenge the finality of the Circuit Court affirmance, as the recent summary rulings of the Maryland Court of Appeals and the Maryland Court of Special Appeals plainly confirm that the Circuit Court decision was non-appealable under Md.Ann.Code art. 41, § 256 (Michie 1982 replacement volume).

**7.** There do not appear to be any published decisions construing § 15–209.

**8.** The Restatement (Second) of Judgments (1982) has recognized the confusing terminology in the area of *res judicata* and has shifted to a "claim preclusion"/"issue preclusion" dichotomy. While not formally adopted by the Maryland decisions, this dichotomy is analytically useful and will be followed here.

proceeding between the same parties, the principle of res judicata applies and all matters actually litigated or that could have been litigated are conclusive in the subsequent proceeding. If a proceeding between parties does not involve the same cause of action as a previous proceeding between the same parties, the principle of collateral estoppel applies, and only those facts or issues actually litigated in the previous action are conclusive in the subsequent proceeding.

*Mackall v. Zayre Corp.,* 293 Md. 221, 228, 443 A.2d 98 (1982); *accord Bankers & Shipper Insurance Co. v. Electro Enterprises, Inc.,* 287 Md. 641, 652, 415 A.2d 278 (1980); *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486 (1977).[9] The Court will address these separate preclusion doctrines in order.

If claim preclusion were to apply here, the doctrine would preclude Bethesda Ford and J.J.F. from pursuing their respective declaration and cross-counterclaim, while the doctrine of merger would prevent Ford and Facilities Co. from litigating their counterclaim.[10] *See* Restatement (Second) of Judgments § 17 (1982). However, as the *Mackall* quotation indicates, a crucial requirement for claim preclusion is that the claim could have been litigated in the prior suit. The MVA itself had no authority to award any of the relief currently sought by any of the parties. Were the parties seeking *res judicata* effect solely on the basis of the MVA administrative determination, claim preclusion would therefore be inappropriate, as the Restatement (Second) of Judgments explains:

The qualifications and exceptions to the rule of claim preclusion have particular importance with respect to adjudications by administrative agencies. One important qualification has to do with the definition of "claim" itself. In the context of civil actions in courts, the term "claim" is broadly defined. This broad definition reflects the fact that in modern practice judicial tribunals usually have comprehensive authority to adjudicate all contentions of fact and all legal theories that may arise from a transaction. Since a judicial tribunal has such comprehensive authority, a litigant may justly be required to avail himself of that authority and to assert in a single action all factual and legal contentions that might be made.

In contrast, the jurisdiction of administrative agencies is usually defined in terms of specified substantive legal provisions, for example, workers' compensation, tax obligations, regulation of a specified business, discrimination in employment, etc. Since the tribunal's authority is delimited in substantive legal terms, the tribunal ordinarily lacks authority to adjudicate claims arising out of the transaction in question but based upon other substantive legal premises. Thus, a workers' compensation commission usually lacks authority to consider claims for punitive damages for injuries intentionally inflicted on an employee in the course of employment; an employment discrimination agency may lack authority to con-

---

**9.** Bethesda Ford attempts to contend that no proof has been offered that J.J.F. is its "privy." However, the cross-counterclaim of J.J.F. specifically asserts that Bethesda Ford is a wholly owned subsidiary of J.J.F. This relationship certainly establishes "privy" status under Maryland law. *See, e.g., Pat Perusse Realty Co. v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968).

**10.** In discussing the doctrine of merger in relation to possible counterclaims which had not been asserted in a previous action, the Maryland Court of Special Appeals has stated,

[i]f a matter is not in the nature of a defense but constitutes a counterclaim, the general rule is that the party is not required to assert the claim unless the subject matter is such an integral part of the issue being litigated that a judgment would necessarily negate the existence of facts essential to its maintenance. *World Wide Imported Car Company, Ltd. v. The Savings Bank of Baltimore,* 41 Md.App. 263, 275, 396 A.2d 547 (Md.Ct.Spec.App.1979). The Court of Special Appeals then indicated that a claim would be "an integral part of the issue being litigated" if it were part of the same "cause of action." The Court of Special Appeals' rule on counterclaims thus does not appear to vary significantly from the standard claim preclusion rule, and does not appear to accord potential counterclaims much of an exemption from the ordinary principles which govern this area.

sider claims based on breach of contract. These limitations on authority of the tribunal should carry corresponding limitations on the scope of "claims" for purposes of the rule of claim preclusion. Restatement (Second) of Judgments § 83 comment g (1982).

█ It is of course true that the MVA determination was immediately followed by a Circuit Court review. However, after careful consideration, the Court concludes that under the peculiar facts of this case, the existence of the Circuit Court review of the MVA decision should not broaden the claim preclusion to be accorded to the state adjudication. On the level of abstract theory, all of the parties could have presented their current claims to the Circuit Court at the time Bethesda Ford sought judicial review of the MVA ruling. However, this would have been certainly out of keeping with ordinary practice, especially in light of the fact that all of these claims which could have been raised were in fact then pending in this Court. To impose such a requirement upon the parties with the luxury of hindsight would be tantamount to "sandbagging" all concerned and the Court holds that for practical purposes the current claims "could not have been litigated" at the time of the Circuit Court review.

█ The matter of "issue preclusion" or collateral estoppel presents entirely different considerations. The fact that issue preclusion is being sought in an action over which the prior tribunal would not have subject matter jurisdiction is not necessarily fatal to its assertion. Restatement (Second) of Judgments § 28 comment d (1982). Instead, the primary concern is that the issue was actually litigated, see, e.g., Mackall, 293 Md. at 228, 443 A.2d 98, and was essential to the initial judgment, Restatement (Second) of Judgments § 17(3) (1982). In making the latter determination, "[t]he appropriate question ... is whether the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment." Restatement (Second) of Judgments § 27 comment j (1982). Issues such as Mr. Fitzgerald's alleged knowledge of the provisions of the DFPP were clearly "recognized by the parties as important" and, as explained earlier, needed to be resolved in order to permit a full resolution of the § 15–209 issue. The Court holds that all issues necessary to the MVA decision, and in particular the MVA findings (1) that Bethesda Ford and J.J.F. knew of the provisions of the DFPP at the time they signed the letter contracts, (2) that Bethesda Ford and J.J.F. breached the 1980 Agreement, and (3) that Bethesda Ford was not in substantial compliance with the terms of its franchise, will be accorded full collateral estoppel effect in litigation of the original declaration and the cross-counterclaim.

The MVA findings will *not* be accorded collateral estoppel or issue preclusion effect in subsequent litigation of the counterclaim. Quoting § 28 of the Restatement (Second) of Judgments, the Maryland Court of Special Appeals recently stated:

Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances ...

\* \* \* \* \* \*

The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action. . . .

*Jack*, 53 Md.App. at 336–37, 452 A.2d 1306. In the present case, the MVA Memorandum and Order placed the burden of proof upon Bethesda Ford, while Ford and Facilities Co. obviously have the burden of proof in their counterclaim. This differential in the burden of proof makes issue preclusion inappropriate for the counterclaim. *Cf.* Restatement (Second) of Judgments § 28 comment f illustration 10 (1982) (party which had to prove absence of contributory negligence as plaintiff in first action not precluded from litigating issue of negligence as defendant in second action).

## APPROPRIATENESS OF SUMMARY JUDGMENT

Summary judgment lies when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Given the issue preclusion effect accorded to the MVA findings, summary judgment is appropriate for five of the eight claims now before the Court:

(1) Count I of the original declaration asserts a claim against Ford for breach of the franchise contract. Under Maryland law, "a party suing on the contract must first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party." *Hubler Rentals, Inc. v. Roadway Express, Inc.*, 637 F.2d 257, 260–61 (4th Cir.1981) (applying Maryland law). As the MVA has conclusively determined that Bethesda Ford did not substantially comply with the terms of its franchise, including specifically the 1980 Agreement, no issue remains on this essential predicate to Bethesda Ford's contract claim.

(2) Count III of the original declaration asserts a violation of Md.Transp.Code Ann. § 15–209 (Michie 1977). This was the precise claim presented to the MVA, and its resolution of that claim obviously mandates summary judgment on an identical count.

■ (3) Count I of the cross-counterclaim seeks equitable reformation of the 1980 Agreement to conform with J.J.F.'s version of that agreement. A fundamental requirement of reformation is that there be a prior agreement which is a variance with a writing which ostensibly reflects that agreement. *See, e.g., Flester v. Ohio Casualty Insurance Co.*, 269 Md. 544, 556, 307 A.2d 663 (1973). However, the MVA has plainly found that there was no such antecedent variant agreement and that the 1980 Agreement in fact accurately embodied the parties' understanding at the time of its execution.

■ (4) In Count II of the cross-counterclaim, J.J.F. seeks specific performance of the parties' "true agreement" and conveyance of the Montgomery Mall land. A contract for the sale of real estate will be specifically enforced when it is fair, reasonable and certain in all its terms. *See, e.g., Gross v. J & L Camping,* 270 Md. 539, 312 A.2d 270 (1973). The MVA has found that the alleged "true agreement" never in fact existed, and specific performance of it plainly cannot be ordered.

(5) Count III of the cross-counterclaim seeks cancellation in equity of the 1980 and 1979 letter contracts. J.J.F. asserts that the alleged mistake it made about the content of the 1979 and 1980 letter agreements renders these contracts "unconscionable." While unconscionability can be a ground for cancellation, *see, e.g., Gladding v. Langrall, Muir & Noppinger,* 285 Md. 210, 213–14, 401 A.2d 662 (1979), the MVA expressly found that the "mistake" never occurred.

■ Despite the MVA findings, summary judgment on the issue of liability is not appropriate for the remaining three of the eight claims before the Court:

(1) Count II of the original declaration asserts that Ford violated Md.Transp.Code Ann. § 15–207 (Michie 1977) by attempting to coerce Bethesda Ford into signing a lease for the Montgomery Mall property. § 15–207 provides in relevant part:

(a) "Coerce" defined.—In this section:

(1) "Coerce" means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences; and

(2) "Coerce" does not mean to argue, urge, recommend, or persuade.

(b) In general.—A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not:

(1) Coerce any dealer to make any agreement with the manufacturer, distributor, or factory branch; . . .

Bethesda Ford alleges that Ford "coerced" it by making certain threats while it was occupying the Montgomery Mall site during the summer of 1981. The MVA did not make any findings relative to these alleged threats, and its Memorandum and Order

cannot support summary judgment on this count. However, the Court stresses that those findings which the MVA did make will have full collateral estoppel effect during subsequent litigation of this count.

(2) Count IV of the original declaration alleges that Ford violated the Federal Dealer Day In Court Act through the previously mentioned "threats and coercion." 15 U.S.C. § 1222 provides:

> An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense any such action the failure of the dealer to act in good faith.

15 U.S.C. § 1221(e) in turn defines the term "good faith" as employed in § 1222:

> (e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

As with Count II of the declaration, the MVA Opinion did not address any events which occurred during Bethesda Ford's 1981 occupancy of the Montgomery Mall facility. Summary judgment on the basis of the MVA Memorandum and Order is thus inappropriate for Count IV, but once again its findings will have collateral estoppel effect in subsequent litigation of this claim.

(3) As previously stated, the MVA findings will not have collateral estoppel effect in subsequent litigation of the Ford and Facilities Co. counterclaim. Summary judgment on the counterclaim would thus plainly be erroneous.

## MOTION FOR INTERLOCUTORY INJUNCTION

Bethesda Ford seeks to preliminarily enjoin Ford from terminating its franchise, apparently on the assumption that Ford's termination has been wrongful. The Fourth Circuit has specified the appropriate standard to be applied on such a motion:

> [I]n this circuit, the trial court standard for interlocutory relief is the balance-of-hardship test. Four factors enter into the determination of whether to grant or withhold interim relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest.

*North Carolina State Ports v. Dart Containerline,* 592 F.2d 749, 750 (4th Cir.1979). The *North Carolina State Ports* court also addressed the appropriate weight to be given to these four factors:

> There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

No "grave or serious" issue exists in the present motion. Bethesda Ford would have the burden of proof in seeking a permanent injunction, and the MVA findings would be accorded collateral estoppel effect at that time under the standards reviewed previously. Given the MVA finding that Bethesda Ford was not in substantial compliance with the terms of its franchise and that Ford did not wrongfully terminate the franchise, permanent injunctive relief would be unavailable. The present motion therefore presents the rare situation where the "likelihood of success on the merits" is not slim but is in fact nonexistent, and the Court has no basis for providing interlocutory relief.

## MOTION TO SUPPLEMENT COUNT IV OF THE DECLARATION

Bethesda Ford seeks to supplement Count IV of its original declaration to include various alleged acts of "coercion and intimidation" that Ford has taken towards it since the franchise fell into terminated status on January 7, 1983. Fed.R.Civ.P. 15(d) provides:

(d) SUPPLEMENTAL PLEADINGS. Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time thereof.

The Fourth Circuit has observed:

Rule 15(d) of the Federal Rules of Civil Procedure provides for a supplemental pleading. It is a useful device, enabling a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted. So useful they are and of such service in the efficient administration of justice that they ought to be allowed as of course, unless some particular reason for disallowing them appears, though the court has the unquestioned right to impose terms upon their allowance when fairness appears to require them.

*New Amsterdam Casualty Co. v. Waller,* 323 F.2d 20, 28–29 (4th Cir.1963) (Haynsworth, J.). The present motion concerns alleged events which have transpired since the filing of the original declaration, and no good reason exists refusing a supplemental pleading.

For the foregoing reasons, it is this 30th day of September, 1983, by the United States District Court for the District of Maryland, ORDERED:

1. That the motion for partial summary judgment BE, and the same IS, hereby GRANTED as to Counts I and III of the original declaration of Bethesda Ford, Inc. and as to all counts of the "counterclaim" filed by J.J.F. Management Services, Inc.;

2. That the motion for partial summary judgment BE, and the same IS, hereby DENIED as to Counts II and IV of the original declaration of Bethesda Ford, Inc. and as to the counterclaim filed by Ford Motor Company and Ford Motor Dealership Facilities Co.;

3. That the July 22, 1982 Memorandum and Order of the Maryland Motor Vehicle Administration in the case of *Bethesda Ford, Inc. v. Ford Motor Co.,* as affirmed by the Circuit Court for Montgomery County, Maryland in a Memorandum and Order of January 7, 1983, be given collateral estoppel effect in subsequent litigation of Counts II and IV of the original declaration of Bethesda Ford, Inc.;

4. That the motion for an interlocutory injunction BE, and the same IS, hereby DENIED;

5. That the motion to supplement Count IV of the original declaration BE, and the same IS, hereby GRANTED;

6. That Bethesda Ford, Inc. shall supplement Count IV of its original declaration

within twenty days of the date of this Memorandum Opinion and Order;

7. That Ford Motor Company shall then have twenty days in which to file a responsive pleading to Count IV of the original declaration as supplemented; and

8. That a copy of this Memorandum Opinion and Order be forwarded to the parties.