946 F.2d 327
 CENTRAL GMC, INCORPORATED, Plaintiff-Appellee,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellant,
Motor Vehicle Manufacturers Association of the United
States, Inc.; Association of International
Automobile Manufacturers, Incorporated;
National Automobile Dealers
Association, Amici Curiae.
 No. 90-2712.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1991.
Decided Oct. 7, 1991.
 
 Daniel Lee Goldberg, Bingham, Dana & Gould, Boston, Mass., argued (William N. Berkowitz, Boston, Mass., Joseph G. Finnerty, Jr., Piper & Marbury, Baltimore, Md., Carol H. Lesnek-Cooper, General Motors Corp., Detroit, Mich., on brief), for defendant-appellant.
 Daniel Christopher Ohly, Hazel & Thomas, P.C., Baltimore, Md., argued (Arnold M. Weiner, Bruce L. Mann, Baltimore, Md., Ronald D. West, West & Feinberg, P.C., Bethesda, Md., on brief), for plaintiff-appellee.
 William T. Lehner, Richmond, Va., James A. Moors, John P. Kitzmiller, Nat. Auto. Dealers Ass'n, McLean, Va., for amicus curiae Nat. Auto. Dealers Ass'n.
 William H. Crabtree, Edward P. Good, Motor Vehicle Mfrs. Ass'n of U.S., Inc., Detroit, Mich., Charles H. Lockwood, II, John T. Whatley, Ass'n of Intern. Auto. Mfrs., Inc., Arlington, Va., Stephen M. Shapiro, Kenneth S. Geller, Mayer, Brown & Platt, Washington, D.C., for amici curiae Motor Vehicle Mfrs. Ass'n of U.S., Inc. and Ass'n of Intern. Auto. Mfrs., Inc.
 Before POWELL, Associate Justice (Retired), U.S. Supreme Court, sitting by designation, and WILKINSON and WILKINS, Circuit Judges.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 The question in this case is whether a truck dealer has separate franchises for purposes of state law in the different lines of vehicles it is authorized to sell. The question of how a franchise should be defined grows out of General Motors Corporation's (GMC) decision to discontinue manufacturing heavy duty trucks. Numerous GMC Truck dealers across the nation have challenged the impact of this decision on their businesses. Here, Central GMC, a Maryland dealership authorized to sell light, medium, and heavy duty trucks, contends that it had a separate franchise in heavy duty trucks that was impermissibly terminated. The district court agreed and awarded Central over $2 million in damages.
 
 
 2
 We reverse. Under the Maryland statute at issue, Central had one franchise encompassing all three lines of trucks. Central's franchise therefore was not terminated when GM discontinued a line of trucks that comprised only part of that franchise. The Maryland statutory scheme governing the franchise relationship was not intended to deter manufacturers from making adjustments in their product mixes dictated by economic circumstances. Indeed, to hold this discontinuance of an unprofitable product a franchise termination would risk sanctioning an impermissible state restraint upon interstate commerce.
 
 I.
 
 3
 Central GMC is a truck dealer in Landover, Maryland which sells several brands of trucks including General Motors, Mercedes, and Kenworth. In 1985, Central GMC and General Motors Corporation entered into a GMC Truck Dealer Sales and Service Agreement. Under this agreement, Central had the right to service GMC trucks and to identify itself as an authorized GMC Truck dealer. Central also had a "non-exclusive right to buy the new GMC Truck motor vehicles identified in the Motor Vehicle Addend[a]" appended to the Truck Dealer Agreement. Four such addenda were attached, and they listed the various models of GMC trucks available for purchase. Two of the addenda pertained to medium duty trucks, one addendum pertained to light duty trucks, and the fourth addendum related to heavy duty trucks. The heavy duty truck addendum itself listed four models of trucks available for sale. That addendum also provided that it "shall remain in effect unless canceled or until superseded by a new Motor Vehicle Addendum." The Truck Dealer Agreement stated that "General Motors may discontinue any line of Product" and that GM would not be liable for a delay in delivering products that was caused by "any discontinuance of manufacture or sale."
 
 
 4
 In 1986, GMC decided to discontinue manufacturing heavy duty trucks. Since the late 1970s, GMC had suffered substantial losses from the production of heavy duty trucks, and its share of that market had apparently become the smallest of the seven major industry competitors within the United States. In fact, from 1981 to 1985 GMC's share of the heavy duty truck market had declined by almost half. Faced with the prospect of sinking a substantial amount of capital into its heavy duty truck operation in order to return it to a competitive position, GMC chose instead to reduce its losses by withdrawing from the heavy duty truck market. Rather than liquidate its American heavy truck operations as it had done with its European operations, GMC in 1986 agreed to transfer assets used in its American operations to a new corporation formed with AB Volvo, a Swedish motor vehicle manufacturer, and two of Volvo's subsidiaries (Volvo).
 
 
 5
 In this enterprise, known as Volvo GM Heavy Truck Corporation, GMC was to occupy a limited role. Volvo owned a substantial majority of stock in the corporation, controlled the board of directors, designated the venture's officers, and ran its day-to-day operations. By December of 1987, with one exception, GMC had discontinued the manufacturing and marketing of heavy duty trucks.
 
 
 6
 In the fall of 1986, GMC began informing its truck dealers about the details of the new enterprise. In September, GMC announced to its dealers including Central that it had reached a tentative agreement with Volvo and that "it is anticipated that not every GMC Truck dealer will be selected to be a part of the new joint venture." In December 1986, GMC notified its dealers that it would discontinue offering heavy duty trucks for sale on December 31, 1987 and that the heavy duty truck addendum would expire on that date. The December letter further stated that "the remaining motor vehicle addenda and the General Motors Corporation Dealer Sales and Service Agreement will not be affected."
 
 
 7
 The Volvo GM corporation selected new dealers for its heavy duty trucks generally from among the existing Volvo and GMC dealers. The selection of dealers for the new corporation was conducted by a committee comprised of three GMC representatives and three Volvo representatives. Because a sales territory often contained both Volvo and GMC dealers, the committee frequently had to choose among dealers. Central was not selected to be one of the new enterprise's dealers. Consequently, when Central's heavy duty truck addendum expired on December 31, 1987, new GMC heavy duty trucks would no longer be available for sale nor would Central sell trucks manufactured by the new corporation. Central retained, however, the right to sell and service GMC light and medium duty trucks. Central also executed an agreement in January 1988 enabling it to continue servicing GMC heavy duty trucks as well as to work on Volvo GM trucks.
 
 
 8
 On December 30, 1987, Central brought an action against GMC alleging that Central had a franchise in heavy duty trucks and that this franchise would be wrongfully terminated under section 15-209 of the Maryland Transportation Code if GMC canceled the heavy duty truck addendum.[1] The action was originally brought before the Maryland Motor Vehicle Administration but was removed by GMC to federal district court. The court, on summary judgment, rejected GMC's principal argument that Central had one franchise in all GMC trucks, not a separate franchise in heavy duty trucks, and that GMC had simply exercised its right to withdraw from the heavy duty truck market. Finding GM liable for a wrongful franchise termination, the district court then determined the damages caused by the termination. The court rejected GM's argument that it had a Seventh Amendment right to a jury trial on the issue of damages. Following a bench trial, the court awarded Central $1,850,701 as the value of its franchise and $277,605 in prejudgment interest.
 
 
 9
 GMC now appeals.
 
 II.
 
 10
 The critical issue in this appeal is whether Central's interest in the sale of heavy duty trucks constitutes a franchise under Maryland law. Central contends that it has a separate franchise in heavy duty trucks corresponding to the addendum to the Truck Dealer Agreement. Central argues that its position is bolstered by the fact that heavy duty trucks occupy a distinct niche in the truck sales market. GMC responds that Central has only one GMC franchise that encompasses the sale of light, medium, and heavy duty trucks. In GMC's view, when it withdrew from the market for heavy duty trucks, Central's franchise remained intact as it continued to sell light and medium duty trucks. We think GMC's position more closely conforms to the statutory definition of franchise and more clearly respects the distinction between discontinuing a product line and terminating an entire franchise.
 
 
 11
 The starting point for our analysis is naturally the language of the Maryland statute. See Dole v. United Steelworkers of America, 494 U.S. 26, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990). Section 11-125 of the Maryland Transportation Code defines franchise as:
 
 
 12
 a written arrangement, whether or not for a definite period, in which a manufacturer, distributor, or factory branch grants to a dealer or distributor a license or right to use a trade name, trademark, service mark, or related characteristic in the sale, leasing, or servicing of new vehicles.
 
 
 13
 One written arrangement, the GMC Dealer Sales and Service Agreement, governs the relationship between GMC and Central. This agreement provides Central with the right to use the GMC trademark. All the trucks distributed to Central under the Agreement were sold under a single trade name, "GMC Truck." The Agreement also gave Central the right to identify itself as "an authorized GMC Truck dealer." Plainly this evidence indicates that Central has one statutory franchise in GMC trucks and that the sale of heavy duty trucks was simply one part of that franchise. Even Central at times appears to recognize the efficacy of this approach to defining its franchise. At one point in its administrative complaint, for example, Central speaks of holding "a franchise to sell GMC trucks." Later in the complaint, Central terms heavy duty trucks a "component" of its GMC franchise. Furthermore, both before and after the heavy duty truck models were discontinued, Central identified itself as a GMC Truck dealer.
 
 
 14
 Central contends, however, that without an addendum to the agreement specifying which trucks it may purchase, it cannot really use GMC's trade name or any of the other rights granted in the agreement. Thus, says Central, a franchise comes into existence only when the dealer agreement is combined with an addendum. Because different addenda exist for each of the three lines of trucks, Central reasons that it has three separate franchises including one for heavy duty trucks. According to Central, its position finds support in the broad interpretation given to the term franchise under Maryland law. See Bethesda Ford, Inc. v. Ford Motor Co., 572 F.Supp. 623 (D.Md.1983).
 
 
 15
 In our view, the addenda are not separate arrangements between the parties, but rather constituent parts of the whole Truck Dealer Agreement. See Lippo v. Mobil Oil Corp., 776 F.2d 706, 713 n. 13 (7th Cir.1985) (franchise agreement consisting of five separate documents executed at the same time is to be read as a whole). "[W]hen interpreting any contract provision, the agreement must be considered as a whole." NSC Contractors, Inc. v. Borders, 317 Md. 394, 564 A.2d 408, 412 (1989). Bethesda Ford, a case relied upon by Central, is not inconsistent with this basic approach to contract interpretation. In that case, the court concluded only that agreements or understandings outside the original Sales and Service Agreement on the leasing of a dealer's facilities could be considered part of its franchise. 572 F.Supp. at 630. Bethesda Ford did not involve the issue of whether a product line constitutes a franchise nor did the case sanction dividing a dealership into separate franchises corresponding to the addenda attached to its main Dealer Agreement. Interpreting the Dealer Agreement as a whole avoids a basic inconsistency in Central's position. Central contends that it has three franchises corresponding to the three lines of trucks it sold, but to follow Central's own logic it would have four separate franchises corresponding to the four addenda. Although two of the four addenda pertain to medium duty trucks, not even Central suggests that it has two separate medium duty truck franchises.
 
 
 16
 Central simply exaggerates the legal significance of the addenda. The addenda merely listed which trucks were available for purchase. They were subsidiary, i.e. addenda, to the main contract and were frequently changed when model offerings varied. When GMC canceled the heavy duty truck addendum, as GMC had reserved its right to do, Central continued to receive other GMC trucks and its rights under the Dealer Agreement remained in effect. In short, Central continued to operate as a GMC Truck dealer well after GMC ceased to make heavy duty trucks.
 
 
 17
 Central also contends that it has a franchise in heavy duty trucks because GMC treated the sales and services of these trucks differently than it treated light and medium duty trucks. See Arthur Glick Truck Sales, Inc. v. General Motors Corp., 865 F.2d 494 (2d Cir.1989); General Motors Corp. v. Gallo GMC Truck Sales, Inc., 711 F.Supp. 810 (D.N.J.1989). For example, Central notes that GMC assigned it a different area of geographic responsibility for heavy duty trucks than it did for the other two truck lines. We are unpersuaded, however. The different assignments not surprisingly stemmed from variations in demand for various truck models over geographic regions. Designating different regions for different products creates no separate franchises in each product when Central is the selling agent for them all.
 
 
 18
 The Maryland statute defines franchise not in terms of whether product lines occupy a distinct niche or are geared to different markets, but rather in terms of written arrangements and the license and right to use a trade name. To adopt Central's proposed approach is not only contrary to the statutory directive but it would also introduce substantial uncertainty into business relationships. To determine whether a franchise existed, parties could no longer look simply to the written arrangement governing their relationship. Instead, the question of franchise existence would require detailed studies measuring product differentiation as well as inquiries into a manufacturer's varying strategies for designing, distributing, and marketing different product lines. The relative importance of each product to the franchisee and/or manufacturer would also have to be examined. A more litigious approach to the law of franchise termination would be difficult to devise--a difficulty which from Central's viewpoint might be avoided only by holding flatly that a dealer has a separate franchise in every product that it sells. The language of the Maryland statute avoids these problems and leads us to the conclusion that GMC has discontinued a product but has not terminated a franchise. See Md.Transp.Code Ann. § 11-125 (Supp.1990).
 
 III.
 
 19
 Central attempts to shift the focus, however, from the language of the statute to its asserted purpose. According to Central, any reading of the statute must be informed by its overarching purpose of protecting vehicle dealers from the superior bargaining power possessed by vehicle manufacturers. To give effect to these protections, Central contends that GMC's withdrawal of the heavy duty truck line should be treated as a franchise termination. We disagree for three reasons: (1) general purposes are a less reliable guide to statutory interpretation than the specific language chosen by the legislative branch to implement those purposes; (2) the general purpose of protecting dealers against abuses of superior bargaining power was not intended to insulate them from every adverse turn in a market economy; and (3) a reading of the Maryland statute equating the discontinuance of a product line with impermissibly terminating a franchise would raise significant commerce clause concerns. As we have addressed the specific statutory language in the preceding section, we now turn to our second and third points of response to Central's position in this case.
 
 A.
 
 20
 Two primary purposes animate Maryland's vehicle franchise act:[2] preventing "frauds, discrimination and other abuses" in the manufacturer/dealer relationship and fostering "vigorous and healthy competition" in the motor vehicle industry. See 1972 Md. Laws, ch. 544 at 1505. Neither of these purposes would be served by interpreting GMC's actions as an impermissible franchise termination.
 
 
 21
 Central is certainly correct that the statute's focus on preventing frauds and other abuses was intended to prevent overbearing behavior by franchisors which often possess greater bargaining power than do their franchisees. See Bethesda Ford, 572 F.Supp. at 630. In this case, however, GMC did not exploit any disparities in bargaining power vis-a-vis Central. It simply withdrew from the heavy duty truck market in a non-discriminatory fashion by canceling all pre-existing heavy duty truck addenda. GMC took these actions in a good faith effort to stem the rising tide of losses associated with its presence in the heavy duty truck market. We do not believe that economic restructuring of this sort is a form of abuse proscribed by the dealer protection statute; rather it is a legitimate response to changed market conditions. See Jimenez v. BP Oil, Inc. 853 F.2d 268, 272-73 (4th Cir.1988); Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 823 (1st Cir.1988) (reporting opinion of the Supreme Court of Puerto Rico on a certified question); American Mart Corp. v. Joseph E. Seagram & Sons, Inc., 824 F.2d 733, 734 (9th Cir.1987).
 
 
 22
 There are, to be sure, many contentions in this case revolving around the question of whether GMC's decision to participate in the joint venture constituted an illegal abuse of its power. Central argues that GMC's continued manufacture of its Brigadier model heavy duty truck for a year after the addendum was canceled evidences a continued participation in the market. GMC responds by noting that while it is true that GMC continued to manufacture the Brigadier for one year, GMC did so as a subcontractor for the joint venture and sold Brigadiers only to the venture. Central points to several other facts which it claims are proof that GMC did not withdraw from the market. These include the following: the inclusion of "GMC" in the brand name of the joint venture's trucks; provision of GMC truck specifications, tooling, and fixtures to the joint venture; mandatory compatibility of the joint venture's truck engines and transmissions with those produced by a General Motors division; and GMC's right to elect a portion of the joint venture's board of directors. Not surprisingly, GMC argues that other facts prove that it has withdrawn from the market, and these include the following: Volvo owns 76 percent of the stock in the joint venture and controls seven of the ten seats on the board; the joint venture is a separate, independent entity with its own management team, manufacturing facilities, and dealer network; GMC has ceased production, dismantled assembly lines, and discharged personnel in its former heavy duty truck division; Volvo contributed far more assets to the joint venture than GMC; and Volvo controls the day-to-day operations of the joint venture.
 
 
 23
 We need not delve into this hornets' nest of charges and countercharges because to do so would only obscure the central point of the analysis: the cessation of production of heavy duty trucks was a legitimate, lawful reaction by GMC to unfavorable market conditions. Once the decision to cease production of heavy duty trucks had been made, GMC faced the choice of complete liquidation of the division or investment of salvageable heavy duty truck assets in a joint venture. GMC opted for the latter course, and we do not believe this to be legally infirm. We again emphasize that it is not the fact that GMC's market response took the form of a joint venture that is controlling so much as the fact that the venture itself represented a legitimate response on the part of GMC to a pronounced decline in the market position of its product. Such a legitimate, nondiscriminatory response to changing commercial realities does not constitute an abuse of superior bargaining power and hence does not run afoul of the purpose of the Maryland statute.
 
 
 24
 A second purpose of the statutory scheme, fostering "vigorous and healthy competition" in the motor vehicle industry, see 1972 Md. Laws, ch. 544 at 1505, would also be disserved if GMC's actions were deemed a franchise termination. Indeed, Central's proposed approach to franchise termination would guarantee franchisees protection from any downturn in the market while denying franchisors the ability to react to that same market by compelling them to pay a substantial penalty to dealers for discontinuing any unprofitable product line. The stated purpose of the Maryland statute, however, is not the narrow one of boundless state protectionism. We cannot read into that purpose an intent on the part of the Maryland legislature to make franchise ownership a virtually risk free endeavor at the cost of eviscerating an entire industry's ability to respond to changing market conditions. See Jimenez v. BP Oil, Inc., 853 F.2d at 272-73; Glaesner v. Beck/Arnley Corp., 790 F.2d 384, 388 (4th Cir.1986); Carolina Truck & Body Co. v. General Motors Corp., 102 N.C.App. 262, 402 S.E.2d 135, 138 (1991). These changing conditions in the heavy duty truck market included decreases in demand, deregulation of the trucking industry, increased international competition, and excess manufacturing capacity. See U.S. Dept. of Commerce, The U.S. Automobile Industry, 1985. Allowing manufacturers to respond to these changes by reinvesting their assets and varying their product mix promotes competition and ultimately benefits consumers, industry employees, and dealers in general. Allowing GMC to discontinue an unprofitable product without the threat of large damage awards thus effectuates an express purpose of the Maryland statute.
 
 B.
 
 25
 Central's approach to the franchise termination issue also raises commerce clause concerns. While the statutory scheme on its face appears to regulate GMC's conduct only in Maryland, "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Healy v. Beer Institute, Inc., 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989). Under Central's approach, unless a company pays a significant penalty to its dealers, it must continue to supply a product, even if the product is plainly unprofitable. If, under the statute, GMC must pay dealers a penalty before it can exit the market, the state has effectively imposed on manufacturers a fee for discontinuing operations in Maryland. Such a penalty, which compensates in-state dealers at the expense of out-of-state manufacturers, obviously increases the costs to companies of redeploying their assets throughout the national economy. Indeed, as more and more states imposed inconsistent and uncertain restrictions on product withdrawals, manufacturers would become increasingly reluctant to make hitherto efficient business decisions. The restrictions implicit in the commerce clause are designed to deflect such rigidity in our national economic system and to prohibit states from hindering the "reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition." Edgar v. MITE Corp., 457 U.S. 624, 643, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982).
 
 
 26
 Central nonetheless asserts that damage awards, unlike injunctions, have only an incidental impact on interstate commerce. See Gallo, 711 F.Supp. at 819. The Supreme Court, however, has noted that impermissible state "regulation can be as effectively exerted through an award of damages as through some form of preventive relief." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). Moreover, the threat of substantial damage awards, by making the cost of exiting the market prohibitive, could have the same effect on GMC's operations as if GMC were formally ordered to continue producing unprofitable heavy duty trucks for the Maryland market.
 
 
 27
 A state may unquestionably act to protect the well-being of businesses within its borders, but its ability to restrict the capacity of national business organizations to respond to changing economic circumstances is not a question that is free of constitutional difficulty. Consistent with established canons of statutory interpretation, we construe statutes so as to avoid doubts about their constitutionality whenever possible. See Commodity Futures Trading Comm'n. v. Schor, 478 U.S. 833, 841, 106 S.Ct. 3245, 3251-52, 92 L.Ed.2d 675 (1986). It is quite possible to interpret section 11-125 of the Maryland Transportation Code in such a fashion. The statute's language and purposes support our holding that Central did not have a separate franchise in heavy duty trucks, and Central therefore is not entitled to compensation from GMC for GMC's nondiscriminatory discontinuation of the heavy duty truck addendum.
 
 IV.
 
 28
 For the foregoing reasons, the judgment of the district court is
 
 
 29
 REVERSED.
 
 
 
 [1]
 Section 15-209 is part of a statutory scheme designed to regulate the relationship between motor vehicle manufacturers and their dealers. Section 15-209(a) provides that "[a] manufacturer may not terminate ... the franchise of a dealer, notwithstanding any term or provision of the franchise, unless: (1) The dealer has failed to comply substantially with the reasonable requirements of the franchise." Section 15-209(e)(2) states that "[i]f the dealer requests a hearing under this subsection, the dealer's franchise continues in effect, notwithstanding any term or provision of the franchise or any other provision of this subtitle, until the [Motor Vehicle] Administration after the hearing, makes a final determination." Section 15-209(f)(1) provides that "[i]n addition to any administrative and criminal sanctions imposed under this subtitle, a manufacturer ... that terminates, cancels, or fails to renew the franchise of a dealer in violation of this section shall pay to the dealer the fair value of his business as a going concern."
 
 
 [2]
 The statute also lists two additional purposes: "to prevent the creation or perpetuation of monopolies and to promote the public safety and welfare." 1972 Md. Laws, ch. 544 at 1505. We think these purposes are largely derivative of those enumerated in the text of this opinion